UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

PATRICIA TOLLIVER )
 )
        Plaintiff, )
 )  No. 1:10-CV-77
v. )
 )  Chief Judge Curtis L. Collier
CHILDREN'S HOME-CHAMBLISS )
SHELTER )
 )
        Defendant. )

**M E M O R A N D U M**

Plaintiff Patricia Tolliver ("Plaintiff") brings this lawsuit against her former employer Children's Home-Chambliss Shelter ("Defendant"), alleging age and sex discrimination, retaliation, and other employment-related claims. Before the Court is Defendant's motion for summary judgment, which is supported by a memorandum (Court Files No. 11, 13). Plaintiff has responded (Court File No. 14), and Defendant has replied (Court File No. 15). For the following reasons, the Court will **GRANT IN PART** and **DENY IN PART** Defendant's motion for summary judgment (Court File No. 11).


I.     **Relevant Facts**

Defendant is a non-profit organization that provides shelter for needy children. From January 18, 2008 until March 3, 2010, Plaintiff was employed by Defendant as a "direct care staff employee" – a position also referred to as a "residential care specialist." Direct care staff employees are responsible for the physical, emotional, social, and educational well being of the children assigned to their care. Prior to working for Defendant, Plaintiff had worked as a mental health technician at Cumberland Hall Hospital for over a year, a developmental technician at Martin Boyd

Christian Center for over a year, a mental health technician at Omni Vision for three years, and a developmental technician at Orange Grove Center for five years.

When Plaintiff was hired, Defendant's president and CEO Phil Acord set her initial rate of pay. This rate was determined by use of a matrix, which factors an employee's experience, education, training, and work experience, to arrive at a dollar figure (*see, e.g.*, Court File No. 12-1). Plaintiff had a high school education, no college credit, no training toward any certifications considered by the matrix (though she did have training in CPR, crisis intervention, and some other areas), and what Mr. Acord considered to be one year of "relevant experience" (Court File Nos. 11-4, pp. 3-4; 12, ¶ 5). Per the matrix, Mr. Acord established Plaintiff's pay rate at $9.25 per hour, which included a $1.00 "differential" due to Plaintiff's working the night shift. Plaintiff claims she was promised a forthcoming raise and promotion to "activities staff" pending a successful evaluation at the end of a six-month probationary period (*see* Court File No. 1-1, ¶¶ 5, 10). Defendant vehemently denies this, claiming all pay raises are considered at the beginning of the calendar year, not at the end of probationary periods, thus Plaintiff would not have been promised a raise at six months (*see, e.g.*, Court File No. 11-5, p. 7).

Defendant's work week begins on Sunday at 12:00 a.m. and ends the following Saturday at 11:59 p.m. Pay periods are two weeks in length. Plaintiff's assigned shift was from 8:00 p.m. to 8:00 a.m. Generally, Plaintiff was scheduled to work 36 hours the first week, and 48 hours the second (Court File No. 11-4, p. 9). If employees worked more than their scheduled hours, they were supposed to submit an "Extra Time Worked Verification Form" so they could be appropriately paid, including pay for overtime (*see id*. at p. 50).

After some time on the job, Plaintiff began to be troubled by what she regarded as

Defendant's improper treatment of female employees. According to Plaintiff, "female direct care staff workers, including the Plaintiff, were required to perform cleaning tasks while the younger, better paid, male workers were not required to clean" (Court File No. 1-1, p. 4). However, Plaintiff acknowledges she was not specifically *told* women were the only employees required to perform cleaning tasks (see Court File No. 11-4, p. 6). Heredia Hester, one of Plaintiff's coworkers, corroborates that women did the "traditional" tasks of cleaning, cooking, dusting, and the like, while the men played basketball or video games with the kids (Court File No. 14-6, p. 6). However, Ms. Hester states she does not know why the men did not do the housework-type tasks, and that it was up to the employees on a particular shift to work out who would do what tasks during the shift (Court File No. 11-6, p. 3).

On July 18, 2008, Plaintiff received her first job performance evaluation (Court File No. 11-4, pp. 46-49). She reviewed this evaluation in a meeting with her supervisors, Mr. Cox and Ms. Pelton. Plaintiff's overall rating was "very good." However, an addendum to the evaluation stated Plaintiff's probationary period was being extended by 60 days so that her direct work and interactions with the children could be further observed.[1] On the line for salary increase, the evaluation said "N/A." Despite this, Plaintiff contends that during the meeting she was told she would receive a raise immediately (*id*. at p. 38).

After several pay periods went by, Plaintiff realized she was not receiving the expected raise (*id*.). Plaintiff complained about this, as well as the perceived inequalities between men and women,

---

[1]According to Defendant, during the probationary period Plaintiff had been partnered with an experienced worker whose involvement overshadowed Plaintiff's direct interaction with the children. Plaintiff's supervisors wanted to observe Plaintiff interacting directly with the children, rather than relying so much on her partner, so they extended the probationary period (*see* Court File No. 11-1, p. 9).

to her immediate supervisor Mr. Cox. Mr. Cox had no involvement in setting pay scales, so he took Plaintiff's concerns to his supervisor, Ms. Pelton, who in turn apparently took the matter to Mr. Acord (Court File No. 14-5, pp. 5-6). Ultimately, Plaintiff did not receive a mid-year pay raise. Mr. Acord testifies such raises, in fact, were never given to anyone, because wage increases for all employees are only given in the first quarter of the calendar year (Court File No. 12, ¶ 3).

Later that month, Defendant hired Mr. Ezzard Robinson as a direct care staff employee. Mr. Robinson worked the same shift as Plaintiff. Mr. Robinson was paid $10.50 per hour – $1.25 more per hour than Plaintiff (Court File No. 14-4). Mr. Robinson was 30 years-old at the time, which was roughly 20 years older than Plaintiff (Court File No. 14-4). Defendant considered Mr. Robinson to have four-and-a-half years of "relevant experience" (Court File No. 12, ¶ 12). It is not clear how Defendant determined what experience counted as "relevant." Mr. Robinson's résumé shows what appears to be three years of employment with rehabilitation centers, a year or two working in restaurants, and several months working as a "disciplinarian" with a camp (Court File No. 12-9, pp. 3-5). Plaintiff's résumé shows 11 years of employment as a mental health technician and developmental technician, yet Defendant credited her with only one year of "relevant experience" (Court File No. 14-1). However, it is undisputed Mr. Robinson had almost completed an associate's degree, while Plaintiff had no education past high school (Court Files Nos. 12, ¶ 12; 12-2, p. 3).

Plaintiff was concerned that Mr. Robinson was being paid more than her. Additionally, Plaintiff believed Mr. Robinson was hired as "activities staff," a position Plaintiff believed she had been promised (Court File No. 1-1, ¶ 10). However, it is undisputed Mr. Robinson's official position was identical to Plaintiff's: direct care staff. Plaintiff's grievance regarding Mr. Robinson, then, was apparently that though they shared the same position, Mr. Robinson had greater

responsibility for planning activities for the children – a task Plaintiff wanted to perform and believed she was entitled to.

In March, 2009, Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), alleging age and sex discrimination with respect to the raise and promotion she believed she was entitled to (Court File No. 11-4, p. 62). The complaint claims Plaintiff was told by Ms. Pelton that she would receive a pay increase at the end of the six-month probationary period. It further claims that during her evaluation meeting at the end of the six-month period, Plaintiff was told she would receive a dollar-per-hour raise immediately, and would be responsible for coordinating activities for the children and overseeing the housework. Of course, Plaintiff was not given a raise or a promotion, and the EEOC complaint attributes this to "Mr. Ezzard Robinson [being] hired and given the job that Ms. Pelton promised me" (*id.*). The complaint further states Plaintiff has tried to meet with Mr. Acord about these issues, but to date has not received a meeting or explanation from him (*id.*).

Subsequently, Plaintiff became concerned about improper calculation of overtime pay. On two occasions, Plaintiff spoke with supervisors about miscalculations of overtime pay. Once, Plaintiff met with Ms. Hamill in the payroll department to complain that hours were missing from her pay stub (*id.* at p. 17). After investigating the matter, Ms. Hamill acknowledged the mistake and apparently paid Plaintiff for the omitted hours (Court File Nos. 14-15, p. 2; 11-4, p. 17). Another time, Plaintiff approached her supervisor Mr. Itula (who had replaced Mr. Cox) about a miscalculation of overtime pay (Court File No. 11-4, pp. 26-27). Mr. Itula apologized for the mistake and paid her for the missing hours (*id.* at pp. 26-27, 60). Plaintiff does not allege any particular occasions where she brought mistakes to her supervisors' attention and the mistakes were

not corrected. Mr. Itula acknowledges there could have been other mistakes besides these, but states "it's also fair to say that when those were brought to my attention I fixed them." (Court File No. 14-13, p. 11). In October, 2009, Plaintiff filed a wage and hour claim with the Tennessee Department of Labor and Workforce (Court File No. 14-16). In it, Plaintiff claimed hours were "taken" from her in retaliation for the EEOC claim filed seven months earlier. Plaintiff included no details regarding actual hours worked or specific shortfalls in paychecks. However, Plaintiff did claim she was entitled to $503.46 in back pay (*id*.).

Beginning in 2009, the Department of Children's Services required Defendant to be accredited. As part of the accreditation process, Defendant was required to conduct evidence-based training in de-escalation techniques (Court File No. 11-2, pp. 7-8). Defendant chose to utilize the "sanctuary" model to satisfy this requirement (*id*.). This type of training consisted largely of group-based activities (Court File No. 11-4, p. 29). On February 12, 2010, Plaintiff's supervisors Mr. Itula and Ms. Pelton met with Plaintiff to go over a performance evaluation that had been compiled in December 2009 (*id*. at pp. 22, 56-59). The evaluation contained a "Professional Development Plan," which included attending the sanctuary-model de-escalation training Defendant was implementing to comply with accreditation requirements. Plaintiff read through the entire evaluation form when she returned home on February 12, 2010 (*id*. at p. 23). Plaintiff was aware that the training referred to in the evaluation would be taking place at her workplace at the end of February (*id*. at pp. 28-30, 32). Plaintiff understood she needed to attend the training (*id*. at p. 30).

Plaintiff did not attend the training. On the morning of the first day of training, Plaintiff was sick with colon problems (*id*. at pp. 30, 32). She called Mr. Itula's cell phone, and left a voice-mail message telling him she would not be attending training (*id*.). However, this phone was not in

service (Court File No. 11-2, p. 14).  Mr. Itula testifies this phone had broken days earlier, and he had instructed Plaintiff to call his other cell phone if she needed to reach him (*id.*).  Mr. Itula further testifies Plaintiff knew how to contact him on his other cell phone, because she did so twice several days before the scheduled training (*id.*).  Plaintiff, for her part, acknowledges she knew Mr. Itula had more than one cell phone, and states she thinks she knew both of the numbers (Court File No. 11-4, p. 31).  Plaintiff missed all three days of training, and never spoke with Mr. Itula during that time (*id.* at p. 32).  Mr. Itula testifies he did not receive Plaintiff's message until his phone was repaired some time later (Court File No. 11-2, p. 15).  Mr. Itula states he would have postponed the training if Plaintiff had properly notified him of her absence (*id.* at p. 14).

On March 3, 2010, Defendant fired Plaintiff for unexcused failure to attend the mandatory training.  Two weeks later, Plaintiff filed this lawsuit.

## II.  Standard of Review

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003).  The Court views the evidence, including all reasonable inferences, in the light most favorable to the non-movant.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).  However, the non-movant is not entitled to a trial based merely on its allegations; it must submit significant probative evidence to support its claims.  *See Celotex*, 477 U.S. at 324; *McLean v. Ontario, Ltd.*, 224

F.3d 797, 800 (6th Cir. 2000). Should the non-movant fail to provide evidence to support an essential element of its case, the movant can meet its burden of demonstrating no genuine issue of material fact exists by pointing out such failure to the court. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

At summary judgment, the Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). If the Court concludes a fair-minded jury could not return a verdict in favor of the non-movant based on the record, the Court should enter summary judgment. *Id.* at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## III. Analysis

As Plaintiff puts it, the "essence of this lawsuit is a violation of the equal pay act and the age discrimination statutes and the retaliation that followed when she complained" (Court File No. 14, p. 9). While this may be the essence of the lawsuit, the complaint appears to advance six distinct claims: 1) failure to promote; 2) disparate pay; 3) disparate treatment; 4) improper calculation and payment of overtime wages; 5) failure to keep proper records; and 6) retaliatory discharge. Defendant contends Plaintiff has failed to show any genuine dispute as to material fact on any of these claims, and therefore judgment as a matter of law in favor of Defendant is appropriate. As explained below, the Court agrees with Defendant with respect to all but one of Plaintiff's claims.

### A. Failure to Promote

Plaintiff's complaint alleges that "[o]n or about August, 2008 rather than promoting the Plaintiff and giving her a raise as promised, a younger, male employee [i.e. Mr. Robinson] was hired

as activities staff . . . ." (Court File No. 1-1, ¶ 10). According to Plaintiff, Defendant's actions constitute unlawful discrimination on the basis of sex and age, in violation of the Tennessee Human Rights Act, Tenn. Code Ann. §§ 4-21-301 *et seq.* ("THRA"), 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), and the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* ("ADEA").

As a threshold matter, Defendant argues Plaintiff's failure to promote claim arising under the THRA must be dismissed as untimely. Plaintiff does not dispute this point. Civil causes of action arising under the THRA "shall be filed . . . within one (1) year after the alleged discriminatory practice ceases." Tenn. Code Ann. § 4-21-311(d). Here, the alleged discriminatory practice was Defendant's failure to promote Plaintiff to "activities staff" following her July, 2008 six-month evaluation, and the contemporaneous hiring of Mr. Robinson. These events occurred approximately 19 months before Plaintiff filed this action. Thus, Plaintiff's failure to promote claim, insofar as it arises under the THRA, is time-barred. Accordingly, the Court will dismiss this claim.

The remaining failure to promote claims arising under Title VII and the ADEA are governed by the same standard, and can thus be analyzed together. *See White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 240 (6th Cir. 2005) (Title VII); *Brennan v. Tractor Supply Co.*, 237 F. App'x 9, 16 (6th Cir. 2007) (ADEA). A plaintiff has two avenues for establishing actionable failure to promote. She "must either present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment in accordance with the *McDonnell Douglas/Burdine* burden-shifting framework." *Brennan*, 237 F. App'x at 16. If a plaintiff advances only circumstantial evidence, she must prove a *prima facie* case of discriminatory failure to promote by showing: "1) she is a member of a protected class; 2) she applied for and was qualified for a promotion; 3) she was considered for and was denied the promotion; and 4) an

individual of similar qualifications who was not a member of the protected class received the job at the time plaintiff's request for the promotion was denied." *White*, 429 F.3d at 240. If the plaintiff establishes a *prima facie* case, the defendant then bears the burden of production to "articulate a legitimate, non-discriminatory reason for its action." *Brennan*, 237 F. App'x at 19. If the defendant articulates such a reason, the burden shifts back to the plaintiff to "produce sufficient evidence from which the jury may reasonably reject the employer's explanation [as pretext]." *Id.*

Here, Plaintiff has presented no direct evidence that Defendant failed to promote her because of her age or sex. Thus, she can avoid summary judgment only by presenting circumstantial evidence sufficient to establish a *prima facie* case of wrongful failure to promote – a task she has not accomplished. While it is undisputed Plaintiff is a member of a protected class, she has failed to show she applied for and was qualified for a promotion, was denied the promotion, and was passed over in favor of an individual of similar qualifications who was not a member of the protected class. While three in number, each of these failures shares one common root: the "promotion" Plaintiff speaks of was, in the eyes of the law, no promotion at all.

It is well-established in the Sixth Circuit that "where an employee wants to transfer to a new position within the same organization, th[e] Court requires the employee to show that the transfer would have been a promotion." *Moore v. City of Columbus*, 129 F. App'x 978, 981 (6th Cir. 2005). A plaintiff can make this showing by demonstrating the desired position "would have provided an increased salary, significantly changed responsibilities, a more distinguished title, or a gain in benefits." *Id.* at 981-82 (quoting *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 183 (6th Cir. 2004). "[A] plaintiff's subjective impression concerning the desirability of one position over another generally does not control with respect to the existence of an adverse employment action." *Mitchell*,

389 F.3d at 183.

Here, Plaintiff alleges she was passed over for a promotion to "activities staff," in favor of Mr. Robinson. However, it is undisputed Plaintiff and Mr. Robinson actually held the same position: direct care staff. Aside from the complaint which states Mr. Robinson was hired as "activities staff," no evidence submitted by either party shows such a position actually existed. In fact, in her response brief, Plaintiff retreats from the assertion Mr. Robinson held the position of "activities staff," and instead refers him being "given the responsibility to be over the activities" (Court File No. 14, pp. 12-13). Plaintiff does not allege she was actually told Mr. Robinson was "over the activities" while she was not. Rather, Plaintiff's characterization of Mr. Robinson is apparently drawn from her observation that Mr. Robinson "always had the credit card" and "always planned the outings" (Court File No. 11-4, p. 14). However, this characterization, assuming it is true, is insufficient to establish the existence of a "promotion" which Plaintiff was denied. Plaintiff admits the responsibility of planning activities would have been in addition to all the other direct care staff job duties; that is, it did displace present duties (*id*. at p. 13). Moreover, Plaintiff does not demonstrate that planning the activities would have provided increased salary, a more distinguished title, or a gain in benefits. *See Moore*, 129 F. App'x at 981-82. Rather, the value of being "over the activities" seems to lie completely in Plaintiff's "subjective impression concerning the desirability of one position over another." *Mitchell*, 389 F.3d at 183. This is not the sort of "promotion" recognized by the law.

Because Plaintiff's desired job duties did not constitute a "promotion," it follows she cannot make out a *prima facie* case that Defendant wrongfully failed to promote her. Accordingly, Defendant is entitled to summary judgment on Plaintiff's failure to promote claims.

**B.        Disparate Pay**

Plaintiff's complaint alleges her "rate of pay was less than that of the other male direct care staff workers even though the Plaintiff performed more job duties than the male workers" (Court File No. 1-1, ¶ 7). Plaintiff claims the pay disparity between her and the male employees violated the federal Equal Pay Act of 1963, 29 U.S.C. §§ 206 *et seq.* ("EPA"), the Tennessee Equal Pay Act, Tenn. Code Ann. §§ 50-2-201 *et seq.* ("TEPA"), and Title VII.

The legal analysis for disparate pay claims brought pursuant to the EPA, TEPA, or Title VII is essentially the same.[2] *Disler v. Target Corp.*, 3:04-CV-191, 2005 WL 2127813, *23 n.26 (E.D. Tenn. Aug. 31, 2005); *see also Odomes v. NuCare, Inc.*, 653 F.2d 246, 250 (6th Cir. 1981). To establish a *prima facie* claim of unequal pay for equal work, a plaintiff has the burden to prove that the employer "pays different wages to employees of opposite sexes for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Vehar v. Cole Nat'l Group, Inc.*, 251 F. App'x 993, 998 (6th Cir. 2007) (quoting *EEOC v. Romeo Cmty. Schs.*, 976 F.2d 985, 987 (6th Cir. 1992)). Once a plaintiff establishes a *prima facie* case of disparate pay, the burden shifts to the defendant to prove the wage differential is justified under one of four affirmative defenses: "(1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex." *Buntin v. Breathitt Cnty. Bd. of Educ.*, 134 F.3d 796, 799 (6th Cir. 1998). Since these are affirmative defenses, the defendant must demonstrate there is no genuine issue as

---

[2]While the EPA's and Title VII's burdens of proof are not wholly interchangeable, and in the "rare, very close case, a plaintiff can succeed on an EPA claim while failing simultaneously to establish a Title VII claim," the Sixth Circuit has rejected this logic as "overly technical." *Vehar v. Cole Nat'l Group, Inc.*, 251 F. App'x 993, 1002 n.3 (6th Cir. 2007); *see also Korte v. Diemer*, 909 F.2d 954, 959 (6th Cir. 1990).

to whether the difference in pay is due to a factor other than sex. *Id.* at 800. Consequently, if the defendant cannot satisfy this burden, the plaintiff is entitled to survive summary judgment even without setting forth evidence from which a jury could infer the employer's proffered reason for the wage differential is pretextual. *Id.* at 799; *see also Vehar*, 251 F. App'x at 1002 ("We have previously held that a Title VII claim of wage discrimination is coextensive with a claim under the EPA insofar as the former incorporates the EPA's affirmative defenses.").

Here, Plaintiff has established a *prima facie* case of disparate pay, because she has put forward evidence tending to show Defendant paid men more than women for similar work. Plaintiff has submitted a chart showing the starting salaries of eleven direct care staff workers (Court File No. 14-4). Defendant has submitted an affidavit corroborating the starting salaries shown on the chart, and also giving the starting salary of an additional direct care staff employee not listed on the chart. Thus, including Plaintiff, the Court has before it the starting salaries of 13 direct care staff employees. Of these, three are woman and ten are men.

The lowest-paid employee is a woman, Sheryl Foster, with a starting salary of $8.75.[3] Neither party has provided information about Ms. Foster's educational background or experience. Above her, two employees, a man and a woman, were hired at $9 per hour.[4] No background information about the woman is provided. The man, Mr. Terry, like Plaintiff has only a high school

---

[3]Ms. Foster, like several of the male employees, began as a part-time worker with a reduced salary ($8 in Ms. Foster's case). However, for purposes of the present analysis, the Court is considering the salaries of the employees once they switched to working full-time, which in Ms. Foster's case brought a salary of $8.75.

[4]The man, Dennis Terry, is not listed on the salary chart. A declaration by Defendant's Financial Services Coordinator Kimberly Hamill states he was hired at an initial rate of $9.00 per hour (Court File No. 15-1, ¶ 3). Plaintiff's memorandum says Mr. Terry was hired at $9.61 per hour, however this statement is unsupported by any evidence.

education (Court File No. 14-2, p. 3).  Above these two employees, three employees were hired at $9.25 per hour: Plaintiff, and two men.  Both men, like Plaintiff, have only completed high school; however, one of the men has done some work towards a college degree (Court File Nos. 12-2, 12-5). Above this cluster are seven more men with salaries and education as follows: a man with a bachelor's degree in psychology starting at $9.75 per hour (Court File No. 12-6); a man with some college starting at $10 per hour (Court File No. 12-12); three men starting at $10.50 per hour, one of whom has a bachelor's degree in recording technology (Court File No. 12-4), one of whom has some college (Court File No. 12-8), and the other of whom has some progress towards an associate's degree (Court File No. 12-9); a man with a bachelor's degree in education starting at $11 per hour (Court File No. 12-11); and a man with a bachelor's degree in marketing starting at $11.28 per hour (Court File No. 12-7).

This salary distribution is sufficient to support a *prima facie* case of disparate pay, which requires showing only that an employer "pays different wages to employees of opposite sexes for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions."  *Vehar*, 251 F. App'x at 998.  Clearly Defendant paid different wages to employees holding the same position of direct care staff.  The question of whether Defendant paid different wages to employees *of opposite sexes*, however, is a close one.  The average starting salary of the 13 employees whose information is before the Court is $9.85, and the mean is $9.75.  All three women made below the mean and the median.  Six of the ten men made above the mean, and seven made at or above the median.  The average woman made $9; the average man made $10.10.  Of the six lowest-paid direct care staff employees, three were women.  Although the data is less than ideal given the small sample size of women, the Court

concludes a reasonable fact-finder could find Defendant tended to pay female employees less than men performing the same job. Accordingly, the Court finds Plaintiff has made out a *prima facie* case of disparate pay.

"Once a plaintiff establishes a prima facie case of wage discrimination, the burden shifts to the defendant to prove that the difference in wages is justified by one of the affirmative defenses." *Id*. at 999. Defendant argues it has satisfied this burden, since it is "undisputed" that Defendant based its compensation decisions on factors other than sex, namely, education and work experience, as set forth in the matrix. However, the Court has reviewed the record and can detect little rhyme or reason to Defendant's payroll methodology. Although Defendant claims salaries are governed by a matrix that weights specific factors, there appears to be little correlation between actual salaries and an employee's education and experience. Thus, while it may in fact be true the different wages paid by Defendant are justified by something other than sex (an affirmative defense), Defendant has not shown this to be the case such that a reasonable jury could not disagree.

Defendant claims salaries were determined through the use of a matrix which values an employee's relevant experience, education, and training. Plaintiff points out, not without justification, that "relevant experience" seems to be a black box, considering Plaintiff's eleven years of mental and developmental health work translated into one year of relevant experience, while Mr. Robinson's three to four years of experience as a drug rehabilitation case manager and camp worker translated into four-and-a-half years of relevant experience. However, even assuming Defendant's calculations of relevant experience were above-board, Defendant does not appear to have set salaries in accord with its own determinations of relevant experience and education. For example, Defendant claims Corey Greene's salary of $9.75 per hour was based upon his bachelor's degree

(in psychology) and three years of relevant experience (Court File No. 12, ¶ 9). At the same time, Defendant states Kareem Brown's salary of $11.28 was based upon his bachelor's degree (in marketing) and one year of relevant experience (*id*. at ¶ 10). In other words, Defendant is representing it paid Mr. Brown more than Mr. Green because Mr. Brown had *less* experience, while at the same time maintaining it paid some employees more than Plaintiff because they had *more* experience.[5]

Defendant faces a low bar in that it need only show its decision to pay male employees more than female employees was based upon "any other factor other than sex." *Buntin*, 134 F.3d at 799. There is no requirement this factor be a sensible one. However, in order to do this, Defendant must, at a minimum, articulate and demonstrate some *reason* that can logically account for the disparate salaries. This Defendant has not done. The matrix provided to the Court – a matrix, by the way, that is from 2010 and is not the one used by Defendant in 2008 – does not appear to logically account for the various salaries paid to direct care staff employees, and Defendant's explanation of why it paid various employees various wages lacks coherence. Thus, the Court concludes Defendant has failed to prove an affirmative defense sufficient to overcome Plaintiff's *prima facie* case of disparate pay. Although it may in fact be the case Defendant based its payroll decisions on factors other than sex, based on the evidence before the Court at this time, a reasonable jury could determine that sex played a role in determining Plaintiff's wage. Accordingly, Defendant is not entitled to summary judgment on Plaintiff's disparate pay claims.

## C. Disparate Treatment

---

[5]Similarly, Defendant claims it paid John Hart $10 per hour based upon "some college" and two years of relevant experience (Court File No. 15, ¶ 15), while justifying Alvin Banks's salary of $9.25 on "some college" and *eight* years of relevant experience (*id*. at ¶ 8).

Plaintiff's complaint alleges the "female direct care staff workers, including the Plaintiff, were required to perform cleaning tasks while the younger, better paid, male workers were not required to clean" (Court File No. 1-1, ¶ 8). Plaintiff claims this constituted discriminatory disparate treatment on account of sex, in violation of Title VII and the THRA.

Discrimination claims under Title VII and the THRA are analyzed identically. *Aldridge v. City of Memphis*, No. 08-6046, 2010 WL 5158411, *6 n.9 (6th Cir. Dec. 14, 2010). Where, as here, no direct evidence of disparate treatment on account of sex exists, "[c]ircumstantial evidence of discrimination is analyzed under the burden-shifting framework set forth in *McDonnell Douglas*." *Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 557 (6th Cir. 2009). In order to make out a *prima facie* case of disparate treatment, a plaintiff must show: (1) she is a member of a protected group; (2) she was subjected to an adverse employment action; (3) she was qualified for the position; and (4) she was treated differently than similarly-situated, non-protected employees. *See Badertscher v. Procter & Gamble Mfg. Co.*, No. 09-4486, 2011 WL 13909, *1 (6th Cir. Jan. 4, 2011).

Here, Plaintiff cannot make out a *prima facie* case of disparate treatment on account of sex, because she has not shown she was subjected to a materially adverse employment action. Material adverse employment actions are those that effect "a significant change in employment status, such as . . . reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Tepper v. Potter*, 505 F.3d 508, 515 (6th Cir. 2007). Such changes "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id*. Plaintiff's disparate treatment claim hinges on her contention female employees were required to perform cleaning tasks, while male employees were not. However, this Court has in the past granted

summary judgment for a defendant where the plaintiff alleged she was required to perform extra cleaning duties while other employees were not. In so holding, the Court has stated "extra cleaning assignments are an alteration of job responsibilities, not a significant change." *Jackson v. Flowers Bakery of Cleveland, L.L.C.*, No. 1:07-CV-112, 2008 WL 2002459, *7 (E.D. Tenn. 2008). The Court concludes the same to be true in this case. Plaintiff does not allege her cleaning duties affected her wages, benefits, or title, and she has put forward no evidence showing the cleaning tasks effectuated a "reassignment with significantly different job responsibilities." *Tepper*, 505 F.3d at 515. The Court concludes the cleaning tasks performed by Plaintiff and other women do not rise to the level of material adverse employment actions, and thus are insufficient to support a *prima facie* case of discriminatory disparate treatment.[6]

Moreover, Plaintiff does not allege she was told by supervisors to perform cleaning tasks, while men were not. Rather, testimony from Ms. Hester – testimony Plaintiff does not dispute – indicates that it was up to the employees on a particular shift to work out who would do what tasks during the shift (Court File No. 11-6, p. 3). That the result of this self-allocation of tasks typically resulted in women performing more "domestic" tasks while men performed more recreational ones does not establish that Defendant *subjected* Plaintiff and other women to this state of affairs. Thus, even if the cleaning tasks Plaintiff complains of were materially adverse employment actions (which they were not), Plaintiff cannot make out a *prima facie* case of disparate treatment because she has not shown she was *subjected* to such actions.

Because Plaintiff has not established a *prima facie* case of discriminatory disparate treatment

---

[6]Plaintiff, herself, concedes in her response brief that she is "not arguing that the cleaning assignments are materially adverse employment actions" (Court File No. 14, p. 11).

on account of sex, Defendant is entitled to summary judgment on these claims.

### D.    Failure to Pay Overtime

Plaintiff alleges Defendant wrongfully did not pay her for overtime hours, in violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq*. ("FLSA").  Additionally, Plaintiff alleges Defendant's failure to properly pay overtime was done in retaliation for her filing an EEOC charge, in violation of Title VII and the THRA.

The FLSA "requires employers to pay their employees time-and-a-half for work performed in excess of forty hours per week."  *Acs v. Detroit Edison Co.*, 444 F.3d 763, 764 (6th Cir. 2006) (citing 29 U.S.C. § 207(a)(1)).  The employee must prove, by a preponderance of the evidence, that she "performed work for which [she] was not properly compensated."  *Myers v. Copper Cellar Corp.*, 192 F.3d 546, 551 (6th Cir. 1999) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946)).  Once liability is proven, the employee must prove her damages through analysis of the employer's records.  However, if the employer kept inadequate records, "the plaintiff's burden of proof is relaxed, and, upon satisfaction of that relaxed burden, the onus shifts to the employer to negate the employee's inferential damage estimate."  *Myers*, 192 F.3d at 551.

Here, Plaintiff cannot survive summary judgment on her overtime claims because she has put forward absolutely no evidence showing she performed work for which she was not properly compensated.  Although Plaintiff claims she was not paid for hours that she worked, and that she "kept calendars" demonstrating she was not being paid properly, she has submitted no evidence to the Court showing this to be the case.[7]  Additionally, Plaintiff claims Defendant failed to pay her for

---

[7] At one point her response brief directs the Court to consider an attached "wage and hour chart" which is not, in fact, attached to the brief.

unscheduled hours (Court File No. 1-1, ¶ 14).  However, nothing in the record indicates Plaintiff made Defendant aware of any unscheduled hours worked for which Defendant did not pay her.  To succeed on an FLSA claim, an employer must know or have reason to believe an employee is working.  *Wood v. Mid-America Mgmt. Corp.*, 192 F. App'x 378 (6th Cir. 2006) (citing *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 718 (2d Cir. 2001)).  Here, it is undisputed that on two occasions when Plaintiff brought mistakes with overtime calculation to her supervisors' attention, these mistakes were remedied.  There is no indication in the record of any occasions when Plaintiff brought overtime shortfalls to her supervisors' attention and the problem was not remedied.  Viewing the evidence in the light most favorable to Plaintiff, the Court concludes no reasonable fact-finder could conclude Plaintiff performed work for which she has not been properly compensated.  Accordingly, Defendant is entitled to summary judgment on Plaintiff's FLSA claim, as well as her Title VII and THRA claims alleging Plaintiff retaliated against her by failing to pay overtime.

### E.     Failure to Keep Proper Records

Plaintiff alleges Defendant "failed to keep proper records, by not reflecting overtime and moving overtime hours to another week," in violation of the FLSA (Court File No. 1-1, ¶ 20).  However, it is well-established failure to keep proper FLSA records is not a cause of action employees can bring.  "[The FLSA] does not authorize employee suits for violations of the FLSA's recordkeeping requirements.  Authority to enforce the Act's recordkeeping provisions is vested exclusively in the Secretary of Labor."  *Elwell v. Univ. Hosps. Home Care Servs.*, 276 F.3d 832, 843 (6th Cir. 2002) (citing 29 U.S.C. § 217)); *see also Powell v. Florida*, 132 F.3d 677, 678 (11th Cir. 1998) (holding the FLSA does not permit employee suits seeking injunctive enforcement of FLSA provisions, and cataloging cases from other jurisdictions holding the same).  Accordingly, Defendant

is entitled to summary judgment on this claim.

###    F.    Retaliatory Discharge

Plaintiff alleges "Defendant devised a retaliatory plan and wrongfully fired the Plaintiff" in response to her filing an EEOC complaint, in violation of Title VII and the THRA. Retaliation claims under Title VII and the THRA are governed by the same standard. *Kessler v. Riccardi*, 363 F. App'x 350, 355 (6th Cir. 2010). If there is not direct evidence of retaliation, as there is not here, the *McDonnell Douglas* burden-shifting framework applies, and the plaintiff must make out a *prima facie* case of retaliatory discharge by showing: 1) she engaged in activity protected by statute; 2) her protected activity was known to the defendant; 3) the defendant thereafter took a materially adverse action against her; and 4) there was a causal connection between the protected activity and the materially adverse action. *Id.* If the plaintiff makes this showing, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action. *Id.* If the defendant satisfies this burden, the burden shifts back to the plaintiff to present evidence demonstrating the proffered reason is pretextual. *Id.*

The only element of Plaintiff's *prima facie* case of retaliatory discharge which is in dispute here is the fourth: causal connection. For a plaintiff to show a causal connection between protected activity and adverse action, she "must produce sufficient evidence from which an inference can be drawn that the adverse action would not have been taken" had the plaintiff not engaged in the protected conduct. *Allen v. Michigan Dept. of Corrections*, 165 F.3d 405, 413 (6th Cir. 1999) (citing *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997)). "A causal link can be shown by either of two methods: (1) through direct evidence; or (2) through knowledge coupled with a closeness in time that creates an inference of causation . . . . However, temporal proximity alone

will not support an inference of retaliatory discrimination when there is no other compelling evidence." *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000) (quoting *Parnell v. West*, No. 95-2131, 1997 WL 271751, at *2 (6th Cir. May 21, 1997)). While Sixth Circuit cases are divided on whether causation can ever be shown *solely* by proximity, *Hamilton v. Starcom Mediavest Grp.*, 522 F.3d 623, 629 & nn.1–3 (6th Cir. 2008), the cases do indicate that "proximity alone generally will not suffice where the adverse action occurs more than a few months – let alone nine months – after the protected conduct," *id.* at 629.

Here, a period of twelve months elapsed between Plaintiff's filing a complaint with the EEOC and her termination. As the *Hamilton* Court stated, proximity alone is generally not sufficient to show causation when the period in question is a few months; much less when the period is nine months, as was the case in *Hamilton*. *Id.* By extension, then, the twelve-month interval between Plaintiff's protected conduct and her termination strongly, if not absolutely, indicates there was no causal connection between the two.

Moreover, Plaintiff has presented little additional evidence from which the Court can infer a causal connection in spite of the long time interval. "[T]he longer the period between the protected activity and the adverse action, the more additional evidence a plaintiff will have to show to convince the court of a causal connection between the two." *S.K. Servs. v. FedEx Ground Package Sys., Inc.*, 1:08-CV-158, 2009 WL 2146211 (E.D. Tenn. July 14, 2009); *see also Nguyen*, 229 F.3d at 567 ("the fact of temporal proximity alone was not particularly compelling, because the plaintiff's retaliation case was otherwise weak"). As additional evidence, Plaintiff cites several alleged wrongs which the Court has already determined are not supported by the evidence, such as failure to promote and failure to properly pay overtime. Plaintiff also claims the replacement of her earlier

supervisor Mr. Cox by Mr. Itula, who allegedly did not view Plaintiff's work as favorably as did Mr. Cox, bespeaks retaliation. However, this conspiratorial allegation, which was not mentioned in the complaint, finds no support in the evidence. Finally, Plaintiff claims the fact that no other employees appear to have been terminated in the past for missing training sessions is sufficient to show causal connection. However, Plaintiff has not shown any other employees have missed the sort of concededly-mandatory training which she missed, or failed to get in contact with supervisors until days later. In sum, the Court finds the year-long interval between Plaintiff's complaint to the EEOC and her termination, coupled with the lack of other compelling evidence indicating retaliation, is an insufficient showing of causal connection to make out a *prima facie* case of retaliatory discharge. Accordingly, Defendant is entitled to summary judgment on these claims.

## IV. CONCLUSION

The Court concludes there are genuine issues of material fact with respect to Plaintiff's disparate pay claims. However, the Court determines there are no genuine issues of material fact with any of Plaintiff's other claims, and Defendant is entitled to judgment as a matter of law. Accordingly, Defendant's motion for summary judgment will be **DENIED IN PART** with respect to the claims for disparate pay, and **GRANTED IN PART** in all other respects. Plaintiff's claims for disparate pay will proceed to trial.

An Order shall enter.


**/s/**_____
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**